UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Equal Employment Opportunity
Commission,

                Plaintiff,

v.

Quality Pork Processors, Inc.,

                Defendant.

Civil No. 01-143 (RHK/JMM)
**MEMORANDUM OPINION AND ORDER**

---

Tina Burnside, Equal Employment Opportunity Commission, Minneapolis, Minnesota, and Rosemary J. Fox, Equal Employment Opportunity Commission, Milwaukee, Wisconsin, for Plaintiff.

John S. Beckmann, Hoversten, Johnson, Beckmann & Hovey, Austin, Minnesota, for Defendant.

---

### Introduction

The Equal Employment Opportunity Commission ("EEOC") brought this action on behalf of a white female, April Landers, who was employed at Quality Pork Processors, Inc.'s ("QPP") slaughterhouse in Austin, Minnesota. Landers claims she was subjected to a racially hostile work environment at QPP by reason of racially derogatory remarks made to her by certain co-workers regarding the African-American man she was dating. Landers also claims that QPP retaliated against her for reporting the racial harassment, and for complaining that her immediate supervisor had not addressed those

1

complaints. The alleged retaliation took the form of transferring Landers to another position at the facility.

Presently before the Court is QPP's Motion for Summary Judgment. QPP argues that the EEOC cannot establish at least one essential element of each of the claims asserted against it -- the hostile work environment claim and the retaliation claim. For the reasons set forth below, QPP's motion will be granted in part and denied in part.

## Background[1]

On December 21, 1998, QPP hired Landers to work at its slaughterhouse facility in Austin, Minnesota. Landers applied together with her boyfriend, Bill Matlock. (Dep. of April Landers, vol. 1, at 62-63 (Dec. 13, 2001 Beckman Aff., Ex. A).) Matlock is African-American. (See id.) Landers and Matlock were hired to work on the same shift, the second shift.[2] (Id. at 66.) Landers was ultimately assigned to the skinning room, where she worked with thirty to thirty-five other workers. (Id. at 70; Wicks Aff. ¶ 3.) During the period in which the alleged incidents of racial harassment occurred, Landers' immediate supervisor was Roger Hansen.

Sometime in January of 1999, two of Landers' co-workers, Steve Guitierrez and

---

[1] The factual background is presented here from the viewpoint of the non-moving party, in whose favor the Court is required to view the evidence on a motion for summary judgment. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997)

[2] Matlock was employed at QPP for several weeks. He was not working at QPP when Landers' coworkers began making the racially offensive comments to her.

Tha Im, began making racially derogatory remarks to Landers regarding Matlock. (Landers Dep, vol. 1, at 384-89 (Burnside Decl. Ex. 13).) Guitierrez called Landers a "nigger lover" and would ask Landers questions like "how is your nigger doing?" (Dep. of Tha Im at 16 (Burnside Decl. Ex. 11); Landers Dep., vol. 1, at 376-379.) Guitierrez would make such comments to Landers every day that he worked with Landers in the skinning room. (Landers Dep., vol. 1, at 385.) If Guitierrez was working in the skinning room with Landers, he would make such a statement to her between one and three times a day during their shift. (Id.) Landers would respond by telling Guitierrez not to use the "n—" word because she did not like it. (Landers Dep., vol. 1, at 379-84; id., vol. 2, at 4.) Im would also make the same racially derogatory statement regarding Landers' boyfriend.[3] (Id., vol. 2, at 6-7.) This behavior continued through early May. (Id., vol. 1, at 127-28, 384-85.) Landers would feel hurt by the remarks and sometimes would go to the restroom during her breaks to cry. (Landers Dep., vol 2, at 11-12.)

During the last week of April 1999, Landers complained about the racial slurs to her supervisor, Hansen.[4] (Id. at 12, 18.) He did nothing to investigate the situation, responding to Landers' complaint by saying that Guitierrez and Im were "just boys." (Id.

---

[3] Im testified that he referred to Landers' black boyfriend as a "nigger" just one time during a conversation in which Landers had told him that Matlock had hit her. (Dep. of Tha Im at 13-14 (Burnside Decl. Ex. 11).)

[4] Hansen denies that Landers ever complained to him about co-workers making racially offensive remarks about her boyfriend. (Dep. of Roger Hansen at 25-26 (Burnside Decl. Ex. 9).)

3

at 18-20.) One evening during the first week in May, Landers did not report to work for her regular shift after having worked overtime the evening before. (Id. at 29; see also Hansen Dep. at 16.) The following day, Hansen reprimanded her for being absent and told her that she could no longer work overtime because she had failed to report to work for her regularly scheduled shift. (Landers Dep., vol. 2, at 32.) According to Landers, Hansen was rude and yelled at her about the issue in front of other employees. (Def.'s Answers to Interrogatories at 1-2 (Burnside Decl. Ex. 6); Landers Dep., vol. 2, at 29.)

On May 6, 1999, Landers met with Dale Wicks, QPP's Director of Human Resources, to complain about the company's attendance policy and the directive she had received from Hansen that prohibited her from working additional overtime.[5] (Landers Dep., vol. 2, at 78; Dep. of Dale Wicks at 15-16 (Burnside Decl. Ex. 15).) At this meeting, Landers also told Wicks that two co-workers had been calling her boyfriend a "nigger." (Landers Dep., vol. 2, at 25-26, 78.) Landers told Wicks that "Tony and Steve" in the skinning room had been making the racially offensive remarks to her.[6] (Id. at 27-28.) She also complained that Hansen had done nothing about the problem when she had

---

[5] After Landers complained to Wicks about the attendance incident with Hansen, Wicks spoke to Hansen, telling him he could not forbid an employee from working overtime where the employee had only missed one day of work. (Burnside Decl. Ex. 9 at 23 (Dep. of Roger Hansen).)

[6] QPP claims that, when Wicks said that QPP needed to investigate the matter and asked Landers to identify who had made the remarks, she refused and declined to identify the department in which they worked.

4

brought it to his attention. (Id. at 26.)

On May 7, 1999, the general foreman for the "night shift kill," Ricky Faith, approached Landers at her work station and told her that he would like to speak with her in his office. (Id. at 53.) Also at that meeting was the night superintendent, Jim Hoffman. (Id.) Landers spoke with them about the racial slurs that had been made to her by her co-workers and the directive from Hansen that she could no longer work overtime because she had been absent from her regularly scheduled shift. (Id. at 53-54.) Faith and Hoffman apologized for how Hansen had handled the overtime situation and told Landers that Hansen should not have denied her overtime. (Id. at 54.) When Landers returned to her work area, Hansen yelled at her because neither she nor anyone else had told him why she had left the skinning room. (Id. at 55.)

Three days later, QPP management transferred Landers to a position QPP had created earlier in the month: fecal contamination inspector.[7] Faith conferred with Hansen and determined that Landers had the requisite skills to perform the fecal contamination inspector position on the night shift. (Def.'s Answers to Interrogs. at 9-11 (Burnside Decl. Ex. 6).) On May 10, Faith told Landers to grab her things because she was moving

---

[7] QPP describes this job as requiring the employee "to check each and every individual side of pork for small and minute bits of foreign material. Foreign material which may be adhering to the side of pork meat could include fecal material, small pieces of liver, kidney or lung, and specks of grease. When an operator encounters such a piece of foreign material, the worker is required to 'trim off' the contaminant as well as the meat around the place. This trimming work is performed by the job operator with a knife held in gloved hands." (Burnside Decl. Ex. 6 at 11 (Def.'s Answers to Interrogs.).)

to a different position where they needed someone with good eyesight who spoke English. (Landers Dep., vol. 2, at 81-82.) Landers was moved to the end of the kill line and was given a bucket of water and a knife and told to scrape off any feces from the anus of the hog. (Id. at 90, 92.) When Landers asked Faith if she was being moved because of her complaints, he did not respond. (Id. at 83.)

After May 10, Landers complained about her transfer to the night union steward, who referred her to another union steward named Emil "Butch" Laack, Jr. Landers told Laack she had been having problems with Hansen, including the fact that, when she told Hansen about the racial comments made to her in the skinning room, Hansen had done nothing. Landers also told Laack that she had talked to Faith about her problem with Hansen and the racially derogatory remarks, following which Faith had moved her to a different job.[8]

On May 26, 1999, Landers and Laack met with Wicks for about one-and-a-half hours. (Def.'s Answers to Interrogs. at 2; Landers Dep, vol. 2, at 122-23.) As part of this discussion, Landers said that Hansen had failed to address her complaint of racial harassment relating back to remarks about her boyfriend.[9] (Landers Dep. vol. 2, at 122-

---

[8] Landers told Laack she wanted to file a grievance. Laack told her that he was not authorized to do that; the Union business agent, Dennis LeBarron, was the person who would have to file a grievance.

[9] According to QPP, when Wicks again asked Landers to name the co-workers who had offended her, she refused, saying that the problem was not ongoing and had been "taken care of."

6

23.) Landers also complained that she had been transferred to the fecal contamination inspector position in retaliation for her complaints about Hansen. (Id. at 131.)

On June 29, 1999, Landers bid for re-assignment to an open position in the livestock pens.[10] Landers transferred to that position on August 16, 1999.

Prior to Landers' transfer to the livestock pens, she filed EEOC complaints against both QPP and the Union. On August 29, 1999, Landers (together with an EEOC representative) participated in a mediated settlement conference with the Union relating to her charge. She identified to the Union the two co-workers who had made the racially offensive comments to her. The union representatives determined that the co-workers should be disciplined and made to apologize to Landers. (Dep. of Dennis LeBarron at 22-24, 28 (Burnside Decl. Ex. 14).) Within a week, Wicks met with both Im and Guitierrez, who admitted their wrongdoing. Both men apologized to Landers personally, and Wicks placed a warning slip in both mens' files. (See LeBarron Dep. at 25-27; Warning Slips (Burnside Decl. Ex. 2.).) On July 13, 2001, Landers quit her job at QPP.

---

[10] According to QPP, the fecal contamination inspection post was temporary and was eliminated from both the day and night shifts once it appeared that quality controls previously in place at the plant were working effectively and USDA inspectors were once again performing their functions competently. The decision to eliminate the position was made in late June, at which time Landers was given an opportunity to "bid" for another job. (Def.'s Answers to Interrogs. at 10 (Burnside Decl. Ex. 6).)

7

## Analysis

I.  **Standard of Decision**

Summary judgment is proper if, viewing the record in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The court must view the evidence, and the inferences which may be reasonably drawn from it, in the light most favorable to the nonmoving party. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).

The nonmoving party may not rest on mere allegations or denials, but rather must demonstrate the existence of specific facts that create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). The court does not weigh facts or evaluate the credibility of affidavits and other evidence on a motion for summary judgment. See Liberty Lobby, 477 U.S. at 249. The nonmovant, however, cannot avoid summary judgment in favor of the movant merely by pointing to some alleged factual dispute between the parties. Instead, any fact alleged to be in dispute must be "outcome determinative under prevailing law," that is, it must be material to an essential element of

8

the specific theory of recovery at issue. See Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997); Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992).

If a party cannot support an essential element of its claim or defense, summary judgment must be granted as to that claim or defense, for a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. See Celotex, 477 U.S. at 322-23. The EEOC has asserted two claims against QPP under Title VII of the Civil Rights Act of 1964: a claim for hostile-work-environment racial harassment arising from the conduct of employees Guitierrez and Im, and a claim for retaliation arising from Landers' transfer to the fecal contamination inspection position. QPP argues that the EEOC cannot establish at least one essential element of each claim. The Court begins with the hostile work environment claim.

## II.     Hostile-Work-Environment Racial Harassment

Title VII provides that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1994) (internal quotation marks omitted). "When the workplace is permeated

9

with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." Id. (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 67 (1986)) (internal citations omitted).

To prevail on its claim that Landers was discriminated against based upon a racially hostile work environment, the EEOC must show that (1) Landers is a member of a protected group, (2) she was subjected to unwelcome harassment, (3) the harassment was based upon race, (4) the harassment affected a term, condition, or privilege of employment, and (5) QPP knew or should have known of the racially discriminatory harassment and failed to take prompt and effective measures to end it. Willis v. Henderson, 262 F.3d 801, 808 (8th Cir. 2001). The fourth essential element of the racially hostile work environment claim has both a subjective and an objective component. Id. at 808-09. Thus, the EEOC must show not only that Landers was subjectively affected by the racially discriminatory behavior but also that the conduct complained of was sufficiently severe or pervasive to create an objectively hostile environment that altered the terms, conditions, or privileges of her employment.

QPP's summary judgment motion focuses on the fourth element in Willis.[11] QPP

---

[11] For purposes of the summary judgment motion, QPP concedes that Landers has standing to complain about the allegedly harassing statements and that the complained-of conduct was based upon race. QPP further acknowledges that there is a genuine issue of material fact as to whether it knew or should have known of the harassment but failed to take prompt and effective remedial action. (Def.'s Mem. Supp. Mot. for Summ. J. at 12.)

10

does not challenge whether, subjectively, Landers was affected by the offensive conduct. Evidence in the record shows that the offensive statements about her boyfriend sometimes caused her to go to the bathroom and cry during her breaks and negatively impacted her desire to go to work. QPP argues that the EEOC's claim of hostile environment race discrimination fails because the statements of Landers' co-workers (although admittedly offensive) were neither sufficiently severe nor sufficiently pervasive to create an objectively hostile work environment.[12]

"Evidence of a hostile environment must not be compartmentalized, but must instead be based on the totality of circumstances of the entire hostile work environment." Delph v. Dr. Pepper Bottling Co., 130 F.3d 349, 355 (8th Cir. 1997) (quoting Gillming v. Simmons Indus., 91 F.3d 1168, 1172 (8th Cir. 1996)). To determine whether there is sufficient evidence from which a jury could find an objectively hostile or abusive work environment, the district court must consider all of the circumstances, including the presence or absence of other people, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

---

[12] QPP also argues that the racial statements that constituted the alleged harassment were not "unwelcome" for two reasons. (Def.'s Mem. Supp. Summ. J. at 11-12.) First, Landers initiated conversations with Guitierrez and Im about her boyfriend; any comments arising out of those conversations could not be considered unwelcome. In addition, the noise level in the skinning room was so high that, if Landers wanted to avoid the offensive statements, she could have simply leaned away from the speaker and been unable to hear the comment. These arguments present disputed issues of fact on summary judgment, viewing the evidence in the light most favorable to the EEOC, and are not persuasive.

11

utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23; Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir. 1999).

Landers does not claim that her co-workers' conduct through early May 1999 was physically threatening or humiliating. Landers missed no work as a result of her co-workers' behavior. (Wicks Aff. ¶ 10; Landers Dep., vol. 1, at 257 (Dec. 13, 2001 Beckmann Aff. Ex. A).) Nor is there evidence tending to show that Landers' job performance changed as a result of the offensive comments. (See Wicks Aff. ¶ 10; Landers Dep., vol. 1, at 258.) She was not reprimanded for doing her job poorly during the time period in which her two co-workers were making the racially derogatory remarks. (Landers Dep., vol. 2, at 12.) Landers also testified that she was unaware of any other racially discriminatory or racially hostile behavior at the plant, other than the two co-workers' actions toward her. (Landers Dep., vol. 1, at 171, 186-87, 195, 198 (Dec. 13, 2001 Beckmann Aff. Ex. A).)

Viewing the record in the light most favorable to the EEOC, the alleged harassment consisted of two co-workers making racially offensive comments to Landers on an almost daily basis for a period of approximately four months. The comments consisted almost exclusively of the question "How is your nigger doing?" -- made in reference to Landers' black boyfriend -- and was sometimes repeated up to three times per shift. Landers would tell the men not to use the offensive word in referencing her boyfriend, and they would respond by laughing at her. Landers also claims that

12

Guitierrez would ask the offensive question more loudly when other workers were present; those workers would hear the remark and laugh. (Landers Dep., vol. 1, at 388.)

From this evidence, the EEOC argues that this case is similar to Carter v. Chrysler Corp., in which a black woman was regularly subjected to verbal abuse, including sexual and racial epithets, over the course of two years. The facts in Carter, however, present a much more egregious picture than the facts presented on the record here, even viewing the evidence in the light most favorable to Landers. In Carter, the plaintiff was subjected not only to verbal abuse but also to rude sexual gestures, "sexual insults were written on the walls of the company restroom, and acts of vandalism occurred in her work area. A picture of a naked man, dead animals, threatening notes, foul-smelling material, and debris were directed at her area." Carter, 262 F.3d at 702. The offensive conduct in this case is limited strictly to verbal statements by two co-employees.

The EEOC argues that the constant use of racial epithets toward a plaintiff is sufficient to establish the existence of a racially hostile workplace. In Ross v. Douglas County, Neb., 234 F.3d 391, 397 (8th Cir. 2000), the court of appeals affirmed a jury verdict finding liability for hostile work environment racial discrimination. The evidence in Ross established that, for over a year, the plaintiff's supervisor at the county correctional facility, a black man, refused to address Ross, also black, as "Officer Ross"

and instead constantly addressed him as "nigger" or "black boy."[13] 234 F.3d at 393. Even though Ross protested that conduct and ultimately filed a grievance, the abusive language did not stop. The supervisor continued to address him using racial slurs until Ross resigned six months later. Id. In Delph v. Dr. Pepper Bottling Co., the court of appeals affirmed the trial court's determination, after a bench trial, that the defendant had constructively discharged the plaintiff by subjecting him to a racially hostile workplace environment. 130 F.3d at 356-57. Delph, the only black employee at the bottling plant, was repeatedly addressed by his supervisor as "nigger," "black boy," "token black boy," and "my little black boy." Id. at 352. Furthermore, Delph's co-workers used racial slurs and told racial jokes at the plant in the presence of the supervisors, who said nothing.[14] Id. This evidence was sufficient to support the trial court's determinations.

Comparing the facts of this case with the facts described above from Delph and Ross, several differences present themselves. The racial epithets in this case were not spoken by a supervisor, but rather by two employees out of a workforce on the second shift of over 100. The duration of the unwelcome conduct here can be measured in months, not years. No racial jokes or other racial comments were made in Landers'

---

[13] The supervisor also occasionally referred to the plaintiff's wife, who was Caucasian, as "whitey." 234 F.3d at 393.

[14] In addition, the plant manager told Delph that he (the plant manager) had been invited to join the Ku Klux Klan and did not want to tell the Klan representative that he (the plant manager) had "one" (i.e., a black person) working for him. 130 F.3d at 352.

14

presence. Even considering these distinctions, however, the Court cannot conclude as a matter of law that no reasonable jury could find that the behavior of Landers' co-employees was merely an isolated instance or two of using insulting language. While the racially derogatory term may not have been used in reference to Landers, the language was intentionally directed at her. Furthermore, the racist epithet used in this case is irredeemably offensive and cannot be characterized, as a matter of law, as being either harmless or casual. See Delph, 130 F.3d at 356-57.

Based on the record before it, there appears to be sufficient evidence from which a jury reasonably could find that the conduct complained of was sufficiently severe or pervasive to create an objectively hostile or abusive work environment. Therefore, summary judgment on the hostile work environment claim will be denied.

### III. Reprisal Claim

To establish a prima facie case of retaliation in violation of Title VII, the EEOC must show that Landers engaged in protected activity under Title VII, she suffered an adverse employment action, and a causal connection exists between the protected activity and the adverse employment action. Sowell v. Alumina Ceramics, Inc., 251 F.3d 678, 684 (8th Cir. 2001). The adverse employment action in question is Landers' transfer to the job of fecal contamination inspector.

QPP argues that Landers' transfer was not an adverse job action. "A transfer involving only minor changes in working conditions and no reduction in pay or benefits

15

will not constitute an adverse employment action." Ledergerber v. Stangler, 122 F.3d 1142, 1144 (8th Cir. 1997). Neither Landers' hours nor her salary were diminished as a result of the transfer, nor was there any impact on her benefits or leave. (Landers Dep., vol. 2, at 97-100, 119.) The environment in which her new job was performed was essentially the same (in terms of ventilation, heat, and lighting) as the environment in the skinning room. (Wicks Aff. ¶ 8.) Furthermore, QPP contends -- and Landers does not dispute -- that the fecal contamination inspector position was less physically demanding than Landers' previous job in the skinning room because she was only required to work on approximately one in eighty hogs in her new position, compared with shaving hair off of the snouts of every hog passing through the skinning room.

Landers complains that, as a fecal contamination inspector, she had to secure a replacement before taking a break because she was responsible for examining each carcass on the line for contaminants; other employees on the kill line did not need to obtain a replacement. (Amended EEOC Charge No. 265990895 at Bates No. 60 (Burnside Decl. Ex. 4); Landers Dep., vol. 2, at 110.) There is no evidence suggesting that Landers was <u>denied</u> breaks or <u>unable to take</u> breaks because she could not secure a replacement. Indeed, Landers acknowledged in her deposition that the transfer to fecal contamination inspector did not change the number or length of her breaks, only their timing relative to when they had occurred in the skinning room. (Id. at 99.) A reassignment constitutes an "adverse employment action" where the changes in duties and

16

working conditions cause the plaintiff a "materially significant disadvantage." See Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994). Needing to secure a replacement to go on break does not rise to that level of disadvantage.[15]

Landers' also argues that, as a fecal contamination inspector, her work responsibilities were diminished. Landers contends that at least thirty-two other employees had "inspected" the carcass before it reached Landers' post. That assertion does not accurately characterize the role of the preceding employees on the kill line. Those "upstream" employees worked on the carcass by removing intestines and other internal organs. (See April 7, 2000 response letter to EEOC (Burnside Decl. Ex. 7); Wicks Aff. ¶ 9.) There is no evidence to support a finding that each employee on the kill line who had handled the carcass prior to Landers had "inspected" it before it moved on to the next operator.

Landers also contends that other acts aside from the transfer were "retaliatory": her paycheck was temporarily misplaced on two occasions (Landers Dep., vol. 2, at 133-36, 142-43); a coworker shocked her with an electric prod (id. at 145-49); her laundry bag developed tears in it, causing some of her work clothes to disappear (id. at 152-58); and

---

[15] To the extent Landers argues that she felt negatively about the transfer, or that other workers at the plant saw the transfer as reflecting negatively on her, those issues are insufficient as a matter of law to constitute an "adverse employment action." See Ledergerber, 122 F.3d at 1144 (discussing Flaherty v. Gas Research Inst., 31 F.3d 451, 457 (7th Cir. 1994), and Spring v. Sheboygan Area Sch. Dist., 865 F.2d 883, 886 (7th Cir. 1989)).

someone flattened a tire on her car while it was parked on the QPP parking lot (id. at 159-63). QPP replies that these other alleged acts of retaliation are not properly before the Court because (1) they are "unexhausted claims" that fall outside the scope of the EEOC charge and (2) Landers cannot link these events to a protected activity -- namely, her complaints of racial harassment. Both arguments are meritorious, particularly the latter. Landers repeatedly testified that she felt the acts described above were "retaliatory." She knew of no evidence, however, that would substantiate those feelings. (See generally Landers Dep., vol. 2, 133-66.) Such subjective "feelings" alone -- without evidence from which a jury could reasonably find the causal link required for the claim -- is not sufficient to withstand summary judgment.[16]

The plaintiff has failed to come forward with sufficient evidence from which a jury could reasonably find that Landers' transfer to the fecal contamination inspector position was an adverse employment action. The other alleged acts of "retaliation" were not charged in the EEOC's administrative process, and there is no evidence of a causal link between those acts and Landers' EEOC charge. Accordingly, the retaliation claim will be dismissed.

---

[16] At most, one could say that the record shows that these additional "retaliatory" acts occurred after Landers and the union met in August 1999 to mediate her discrimination charge. QPP did not participate in that mediation. Merely because something occurs after an event does not compel an inference that it occurs as a result of the event.

## Conclusion

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS ORDERED** that Defendant Quality Pork Processors, Inc.'s Motion for Summary Judgment (Doc. No. 17) is **GRANTED IN PART**. The EEOC's claim for retaliation is hereby **DISMISSED WITH PREJUDICE**. The parties will proceed to trial on the hostile work environment racial discrimination claim under Title VII.

February _1_, 2002

RICHARD H. KYLE
United States District Judge